UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Docket No. 1:21-CR-10228-FDS |
| DANIELLE MILLER, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## UNITED STATES' SENTENCING MEMORANDUM

Defendant Danielle Miller is a recidivist fraudster who devised and executed a complex criminal scheme in order to fund the lavish lifestyle required to maintain and grow her social media presence. The Defendant misused the identities of numerous victims to steal more than $1.2 million from pandemic-related benefit programs, resulting in her present conviction on three counts of wire fraud and two counts of aggravated identity theft. The egregiousness of the Defendant's conduct – especially in light of the privileged upbringing that distinguishes her from the majority of federal defendants – merits a significant sentence of imprisonment. Yet, in evaluating the aggravating factors, the Court must balance certain mitigating circumstances relating to the Defendant's prior trauma and current health. Taking all of these factors into consideration, the United States submits that a sentence of 60 months imprisonment is sufficient but not greater than necessary to achieve the goals of sentencing articulated in 18 U.S.C. § 3553(a)(2).

This memorandum seeks to support the requested sentence by providing (1) an overview of pandemic assistance programs; (2) a summary of the Defendant's offense conduct; (3) discussion of the advisory sentencing guidelines; (4) articulation of the United States' sentencing recommendation; (5) a comparison with other recent pandemic fraud cases prosecuted in the

1

District of Massachusetts; and (6) a justification for the recommended sentence based on certain factors set forth in 18 U.S.C. § 3553(a).

## Overview of Pandemic Assistance Programs

The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 to provide emergency financial assistance to Americans suffering the economic effects of the COVID-19 pandemic. Among the benefit programs created or expanded by the CARES Act were the following:

- Economic Injury Disaster Loans ("EIDLs"), which were provided by the United States Small Business Administration ("SBA") to small businesses that suffered "substantial economic injury" from COVID-19;

- Small business loans generated via the Paycheck Protection Program ("PPP"), which were intended to cover expenses including payroll and mortgage interest or rent to allow businesses to continue to employ workers during the pandemic slowdown. PPP loans were processed by private lenders and guaranteed by the SBA; and

- Pandemic Unemployment Assistance ("PUA") benefits, which provided unemployment payments to workers who were not otherwise eligible, including those who were self-employed, independent contractors, or gig economy workers. PUA benefits were administered by various state agencies.

While the CARES Act benefit program assisted millions of needy Americans who were struggling during the 2020-2021 downturn, and allowed countless legitimate businesses to stay open during this time of economic hardship, criminal actors managed to divert and misuse billions of dollars in pandemic benefits.[1]

---

[1] *See, e.g., The Great Grift: How billions in COVID-19 relief was stolen or wasted*, https://apnews.com/article/pandemic-fraud-waste-billions-small-business-labor-fb1d9a9eb24857efbe4611344311ae78 (last accessed on August 30, 2023). Dozens of these fraudsters have been prosecuted federally in the District of Massachusetts, and a comparative analysis of some of the sentences imposed follows below.

**Summary of Offense Conduct**

In November 2020, a resident of Massachusetts ("Victim 1") reported to local police that her identity had been misused in connection with an application for a residential lease in Texas. *See* Criminal Complaint Affidavit in 23-mj-5198-JGD at Docket 1 ("Complaint"), ¶ 8. Subsequent investigation uncovered that Victim 1's identity had also been fraudulently used for the following:

- to obtain a counterfeit Massachusetts driver's license in the name of Victim 1;
- to open a TD Bank account in the name of Victim 1;
- to obtain an EIDL of $102,000;
- to obtain services valued at thousands of dollars at a Miami cosmetic center;
- to book a private charter flight from Florida to California;
- to book a stay at a luxury hotel in West Hollywood, California; and
- to apply for PUA benefits in the name of Victim 1.

*See* Presentence Investigative Report ("PSR") ¶ 17.

Investigators learned that the IP address used to open the TD Bank account in the name of Victim 1, and to apply for an EIDL that funded that account, was also used to access the website of the Massachusetts Registry of Motor Vehicles ("RMV"). Complaint at ¶¶ 12, 24. The user of this IP address accessed the "myRMV" account of Victim 1 and 26 other victims over five days in August 2020. *Id.* The presumed fraudster submitted SBA loan applications in the names of 10 of these victims within minutes of having accessed the pertinent myRMV accounts. *Id.* ¶ 24.

Having discovered that someone was fraudulently using the identity of Victim 1 and, seemingly, dozens of other Massachusetts residents, investigators then undertook efforts to identify the perpetrator. Investigators examined spending associated with the TD Bank account

in Victim 1's name and found various charges at luxury hotels, including at the Petit Ermitage in West Hollywood, California and the Beverly Hills Hotel in Beverly Hills, California. *Id.* ¶¶ 32-33. The investigation uncovered an image of the Defendant that had been posted on her Instagram account, posing by a Rolls Royce at the Beverly Hills Hotel, and another image of the Defendant geo-tagged at the Petit Ermitage.[2] The Instagram account at issue, "killadmilla," had more than 34,000 followers and was widely known to be the Defendant's account. *Id.* ¶¶ 35-36

Having identified the Defendant as the likely perpetrator of the identity theft scheme involving Victim 1 and others, investigators utilized additional spending records and Instagram posts to track her to a specific luxury condo in Miami, which the Defendant had rented renting using the name of another victim ("Victim 2"). PSR ¶ 19. In May 2021, investigators executed a search warrant at this condo and seized items including the following:

- 14 TD Bank cards for accounts in various names;

- More than 35 counterfeit driver's licenses bearing various names but the Defendant's photo, including licenses that purported to be issued by Massachusetts, California, Arizona, Wisconsin, and Texas

    o These included a counterfeit Massachusetts license in the name of Victim 1 and a counterfeit Wisconsin license in the name of Victim 2;

- A notebook containing a "To do" list for October 11, 2020, which included the notes "apply for 10 SBAs" and "open at least 8 TD accounts;"

- Handwritten scripts for apparent use in applying for SBA loans – for example, "From Covid 19 to the winter storms, I need this EIDL to provide the necessary working capital to help my small business survive until normal operations will resume;" and

- Various luxury items, including a Rolex watch, a Louis Vuitton bag, and two Rimowa suitcases.

---

[2] These images appeared to depict the same individual whose photo appeared on the counterfeit driver's license in the name of Victim 1, which had been used to charter a private jet from Florida to California. *Id.* ¶¶ 30, 33.

*Id.* ¶ 15.

Overall, investigators learned that the Defendant had engaged in an identity theft and pandemic benefit fraud scheme that involved fraudulent PPP loans and EIDLs that had disbursed more than $1.1 million, as well as tens of thousands of dollars in fraudulent PUA benefit payments from the states of Arizona, California, Kansas, Texas, and New York. *Id.* ¶ 45. The Defendant also submitted dozens of other applications for SBA loans that were not ultimately funded. *Id.* ¶ 46.

### Advisory Guideline Range

In fashioning a sentence, the Court must consider the range specified by the U.S. Sentencing Guidelines ("USSG"), although the guidelines are merely advisory, and the Court must also proceed to consider the factors set forth in 18 U.S.C. § 3553(a). *See, e.g., United States v. Abbott*, 1:19-cr-10117-IT (D. Mass., September 13, 2019) (*citing United States v. Booker*, 543 U.S. 220, 264 (2005)); *see also* USSG § 1B1.1.

Here, U.S. Probation has calculated the guideline range as 78 – 97 months on Counts One through Three (the wire fraud convictions)[3], plus a mandatory 24 to 48 months consecutive on Counts Four and Five (the aggravated identity theft convictions). PSR, p. 34. This calculation produces an effective low-end sentencing point of 102 months imprisonment.

The parties calculated the offense level applicable to Counts One through Three to be two levels lower than the offense level as calculated by U.S. Probation ("USPO"). *Compare* Plea Agreement (Docket 79), ¶ 4 with PSR ¶¶ 59-70. This arises from a difference in calculating the amount of intended loss – the parties had calculated this to be more than $1.5 million but not

---

[3] This calculation is premised on an offense level of 26 on Counts One through Three, combined with a Criminal History Category of III to produce the range of 78 – 97 months.

more than $3.5 million, whereas USPO has calculated the total intended loss to be approximately $5.2 million. *See* PSR ¶ 46.[4]  Neither party has objected to USPO's loss calculation, and the United States submits that the guideline sentencing range reflected in the PSR is correct. However, the United States wishes to stand by the calculation of loss amount reflected in the parties agreement, and respectfully asks that the Court consider a two-level variance commensurate with a loss level of more than $1.5 million but not more than $3.5 million.  With such a variance, the effective low-end sentencing range would decrease from 102 months to 87 months (63 months on Counts One through Three plus 24 months on Counts Four and Five).

In addition, USPO has calculated the Defendant to be Criminal History Category ("CHC") III, based in part on three points derived from her October 2022 sentence for fraudulent identity use in Sarasota County, Florida.  PSR ¶ 75.  Neither party has objected to USPO's criminal history calculation, and the United States submits that it is correct.  It is worth noting, however, that the Defendant had indicated her intention to plead guilty to the instant case before the October 2022 sentence was imposed.  *See, e.g.*, Docket 62 (scheduling of Rule 11 hearing in September 2022).  Had the Defendant been sentenced on her current federal case prior to the Sarasota County case, she would qualify as CHC II instead of CHC III.  The United States respectfully asks that the Court consider a variance to factor in the Defendant's CHC at the time she articulated her intention to plead guilty.  The effective low-end guideline range if the Defendant were considered to be CHC II, with the two-level loss variance discussed *supra*, would be 81 months.

---

[4] USPO considered additional loan applications that had been denied, and included estimates of the likely payouts of these loans had they been approved, in calculating intended loss.

**Sentencing Recommendation**

The United States recommends that the Court accept the parties' plea agreement, which specifies an agreed sentence of 60 months imprisonment[5] and 36 months of supervised release. Docket 79, ¶ 5. The United States does not object to this sentence being imposed concurrently to the Defendant's previously-imposed sentence in Sarasota County, Florida.

The Court should also order restitution in the amount of $1,277,590, payable to the government agencies listed in ¶ 133 of the PSR. The plea agreement calls for the Court to impose a fine within the guideline sentencing range, unless the Court finds that the Defendant lacks the financial resources to pay a fine. Docket 79, ¶ 5. The United States requests a fine of $50,000, which falls within the guidelines range of $25,000 - $250,000.[6]

The Court has already issued a Preliminary Order of Forfeiture that includes approximately $572,000 in funds seized from bank accounts controlled by the Defendant, approximately $27,000 in money orders seized from the Defendant's residence, and approximately $4,000 in cash seized from the Defendant's residence. Docket 84. The Court has further issued a forfeiture money judgment in the sum of $1,307,294. Docket 85.

---

[5] Such sentence would be comprised of incarceration of 36 months as to Counts One through Three (wire fraud), to be imposed concurrently as to each other, and incarceration of 24 months as to Counts Four and Five (aggravated identity theft), to be imposed concurrently as to each other but consecutively as to Counts One through Three.

[6] Based on the luxury assets referenced in ¶ 115 of the PSR, it appears that the Defendant has the ability to pay such a fine, even factoring in costs associated with disposing of these items.

**Comparison to Other Pandemic Fraud Cases**

A term of 60 months of imprisonment would appear to be at the top-end of sentences imposed in this district arising from pandemic benefit fraud – including those imposed on defendants with prior fraud convictions.  *See, e.g., United States v. Roosevelt Fernandez*, 1:21-cr-10046-RGS (60-month sentence for defendant with prior federal conviction who fraudulently obtained approximately $275,000 via two fraudulent EIDLs; this defendant also executed a separate tax fraud scheme); *United States v. Tiffany Pacheco*, 1:21-cr-10025-IT (42-month sentence for defendant with prior federal conviction who misused public position to obtain almost $200,000 in fraudulent PUA benefits); *United States v. John Casey*, 1:20-cr-10202-ADB (48-month sentence for defendant who fraudulently obtained over $675,000 in EIDL and PPP funds, and who also committed two unrelated fraud schemes); *United States v. Elijah Buoi*, 1:20-cr-10130-FDS (39-month post-trial sentence for defendant who submitted fraudulent applications for millions in PPP loans but accessed and spent less than $30,000 in proceeds); *United States v. Loc Vo,* 1:22-cr-10286-WGY (24-month sentence for defendant who received over $1.5 million based on multiple fraudulent loan applications); *United States v. Shane Spierdowis*, 1:21-cr-10095-RGS (24-month sentence for defendant with prior federal conviction who obtained approximately $190,000 via two fraudulent loans); and *United States v. Dana McIntyre*, 1:21-cr-10162-DJC (24-month sentence for defendant who fraudulently obtained more than $660,000 in PPP loan funds).

To be sure, the value of these types of comparisons is somewhat limited given the case-specific circumstances that drive sentencing in each case.[7]  And such comparisons are inherently imperfect when contrasting this Defendant – who benefited from a highly-advantaged upbringing and used her stolen goods to pursue a lifestyle marked by glamor, luxury, and influence – with other fraud defendants who were raised with far less privilege.  *See, e.g., United States v. Bernadin*, 1:22-cr-10110-IT (PPP fraud committed by defendant who grew up in poverty in Haiti); *United States v. Cordor*, 4:21-cr-40016-TSH (SBA loan and PUA fraud committed by defendant who grew up in housing project in Worcester); and *Buoi* (PPP fraud committed by defendant who was coerced into serving as a child soldier in wartime Sudan).

Despite these imperfections, the aforementioned case comparisons provide a sense of the consequences imposed on other COVID fraud defendants, each of whom took advantage of a public health crisis and related economic downturn to exploit one or more of the same government benefit programs as this Defendant.

## Justification for Sentencing Recommendation

The United States submits that a total sentence of 60 months imprisonment is an appropriate sentence in consideration of the sentencing guidelines and the various factors enumerated at 18 U.S.C. § 3553(a).  This sentence is below the advisory guidelines range, even accounting for the requested variances relating to loss and criminal history reflected above.  However, it is at the very top of sentences imposed in other pandemic fraud cases in this district, and overall appears to be sufficient but not greater than necessary to achieve the goals of

---

[7] It bears mention that the Defendant in this case obtained and spent a larger amount in fraudulent proceeds, and did so using a larger number of stolen identities, than most of the aforementioned defendants.

sentencing. *See, e.g., United States v. Vargas-Garcia*, 794 F.3d 162, 168 (1st Cit. 2015) (sentences are subject to the "parsimony principle," whereby the Court shall "impose a sentence sufficient, but not greater than necessary, to achieve the legitimate goals of sentencing") (cleaned up). By any measure, five years is a significant amount of time in a person's life, and such period of incarceration is sure to have serious consequences for this Defendant. Any sentence above this – even considering the aggravating factors present here – would be excessive in light of the sentences imposed in other pandemic fraud cases and certain specific mitigating circumstances specific to this Defendant.

Among the most critical of the statutory sentencing factors that the Court will assess are those set forth at 18 U.S.C. § 3553(a)(1) – the nature and circumstances of the offense and the history and characteristics of the Defendant. In evaluating these factors, the Court should accord significant weight to the following seven factual propositions:

(1) <u>Defendant Had an Unusually Privileged Upbringing</u>

The Defendant grew up a stones-throw from Central Park South and was raised by prominent parents. PSR ¶¶ 85-86, 88-89. She attended an elite private school in New York, followed by college and graduate school. *Id.* ¶ 106. The Court should treat the Defendant's privileged background as an aggravating factor, as she was afforded far more material advantages in life than the vast majority of criminal defendants.

(2) <u>Defendant Has Suffered Extreme Trauma</u>

As detailed in the PSR, the Defendant suffered extreme trauma at a young age. *Id.* ¶ 100. The Court should treat the Defendant's trauma as a mitigating factor, as it almost certainly played a significant role in leading her to the poor decision-making that caused this and her other convictions.

(3) <u>Defendant Suffers from Significant Health Issues</u>

As detailed in the PSR, the Defendant suffers from significant health issues that have negatively impacted her time in custody, and that will surely cause complications while she is serving her sentence. *Id.* ¶¶ 95-96. The Court should treat the Defendant's medical condition as a mitigating factor, as it will negatively impact her quality of life while incarcerated.

(4) <u>Defendant is a Recidivist</u>

Prior to committing the crimes charged in the instant case, the Defendant committed additional identity theft crimes for which she was convicted in New York (2019) and Florida (2022). *Id.* ¶¶ 74-75. The Defendant appears to be proud of her record of committing fraud, telling a journalist while on pretrial release for this offense "***I more so consider myself a con artist than anything***…. You know how they have that saying that you can sell ice to an Eskimo? If there's something that I want, I'm getting it" (emphasis added). *See* New York Magazine, February 9, 2022, *What Danielle Miller learned at Horace Mann and Rikers* (hereafter, the "NYM Article").[8] The Court should treat the Defendant's recidivism – and her apparent pride in it – as an aggravating factor, as it suggests greater punishment is necessary for the Defendant to be motivated to change her ways.

(5) <u>Defendant's Crimes were Complex and Extensive</u>

Various other pandemic fraud defendants have been charged in federal court for misusing just one or two identifies, or for applying for a small number of loans. Not this Defendant – she used dozens of stolen identities to apply for dozens of fraudulent loans and for PUA benefits via numerous state agencies. Her fraudulent conduct stretched from Florida to California – and

---

[8] Available at nymag.com/intelligencer/article/danielle-miller-scammer.html (last accessed August 31, 2023).

literally in between, as she traveled via private jet chartered under a stolen identity. She obtained dozens of counterfeit driver's licenses and opened dozens of bank accounts designed to receive her fraudulent proceeds and to mask her role with the fraud. Her conduct impacted individual victims from across the country – including the one victim from Massachusetts whose report of identity theft led to the unraveling of the scheme.

The Defendant seemingly treated her identity theft and benefits fraud scheme as a full-time job. She set apparent quotas for her criminal output – exhorting herself to "apply for 10 SBAs" and "open at least 8 TD accounts" in one particular day. PSR ¶ 15. She also authored scripts – in effect, applying quality control techniques to guide her fraudulent loan scheme. *Id*. The Court should treat the widespread scope and formalized nature of the Defendant's crimes as an aggravating factor, as it indicates a higher level of premeditation and criminal intent.[9]

(6) <u>Defendant was Motivated by Greed and Influence</u>

It is fair to infer that the Defendant committed her crimes both for the purpose of experiencing the pleasures of living a luxurious lifestyle and for the purpose of showing it off. She broadcast the fruits of her crimes – designer handbags, private jet travel, luxury hotels, and a high-rise condo – to her tens of thousands of Instagram followers. It appears that the Defendant's pursuit of social media status was a prime motivating factor for her criminal conduct – though it also helped facilitate her capture.

---

[9] The calculation of the Defendant's guideline range already accounts for the fact that her offense involved sophisticated means pursuant to USSG § 2B1.1(b)(1)(C), including the use of shell companies. PSR ¶ 62. But the scope and premeditation of the Defendant's scheme goes beyond what is contemplated by this particular guideline enhancement, and should be considered as an aggravating factor even despite the fact that the guidelines calculation already takes into account the sophisticated nature of the Defendant's scheme.

The Defendant does not seem to have learned of the dangers of notoriety as – even after her federal arrest – she has continued to publicize her crimes to gain attention. As noted, in 2022, the Defendant proclaimed to New York Magazine that she considers herself to be a con-artist. The Defendant posed for a photograph published in this same article while lounging and smoking, with her court-ordered ankle monitor visible. *See* NYM Article.[10] The Defendant also bragged in that article that, due to being "locked up," her Instagram account "has thousands, thousands of DMs asking me what my Telegram name is to work with me. Thousands." *Id.* She further boasted, "I'm so sought after it's insanity." *Id.*

More recently, in April 2022, the Defendant appeared on the Spotify podcast Forbidden Fruits, during which she and the show's hosts discussed her designer purchases, her luxury travel, and the search of her Miami apartment by federal agents.[11] The Defendant denied using SBA loans to fund her luxurious lifestyle, instead insisting that this was funded by her income from her work at Epoch Advisory and by "rich boyfriends." Podcast at appx. 56:00, 59:00. The Defendant also disclaimed any knowledge of the fake IDs seized from her apartment – while conveniently omitting mention of the fact that her own photo appears on these dozens of counterfeit licenses. *Id.* at appx. 58:00.

---

[10] *See also* WPLG Local 10, *New Yorker Danielle Miller pleads guilty to $1.5M fraud involving luxury apartment, prosecutors say*, available at www.local10.com/news/local/2023/03/06/new-yorks-dani-miller-pleaded-guilty-to-15m-fraud-involving-miami-luxury-lifestyle-prosecutors-say/ (last accessed August 31, 2023) (the Defendant "was at the center of investigations when she flaunted her black GPS ankle monitor on a "#housearrest" TikTok post that got over 2,000 hearts").

[11] Accessible (with subscription) at open.spotify.com/show/4iZGIW1kjyQ7QNgx9C1mSN (last accessed August 31, 2023).

The Court should treat the Defendant's prior and continuing efforts to use her criminal conduct to garner attention and social media influence as an aggravating factor, as this intimates a keen disrespect of the law and suggests a lack of remorse.

(7) <u>Identity Theft Causes Untold Harms to Victims</u>

In imposing sentence, the Court should consider the considerable harms suffered by victims of identity theft generally. For example, studies conducted by the Identity Theft Resource Center reflect that many victims of identity theft report suffering financial-related problems, including being turned down for loans or being unable to secure housing. *See* www.idtheftcenter.org/publication/identity-theft-the-aftermath-study (last accessed August 31, 2023). Many who were victimized by pandemic-related identity fraud in 2020 reported that their issues were still unresolved as of April 2021. *Id*. In addition, a significant percentage of victims of pandemic-related identity theft have reported being denied unemployment benefits because someone applied using their information (24% of reporting individuals), being more stressed than usual (54%), or feeling violated as a result of the identity theft (54%). *See* www.idtheftcenter.org/wp-content/uploads/2021/05/2021-ITRC-Consumer-Aftermath-Responses-Pandemic-Related.pdf (last accessed August 31, 2023).[12] The Court should treat the widespread nature of the Defendant's identity theft as an aggravating factor, as such conduct tends to inflict serious harm onto completely innocent victims.

---

[12] The United States has not received information indicating that individual victims in this case have suffered these specific types of harms.

**Formal Response to Procedural Order**

In response to the Court's Procedural Order (Docket 76, ¶ 10), the United States responds as follows:

(a)(1)(a):  for the reasons set forth above, the United States will seek a sentence of 60 months, which falls below the applicable guideline range;

(a)(1)(b):  the United States submits that there are no legal questions that are not adequately addressed in the PSR or otherwise; and

(a)(1)(c):  the United States submits that there are no factual questions that require further attention, and that an evidentiary hearing is not required.

**Conclusion**

For the foregoing reasons, the United States respectfully asks that the Court accept the parties' plea agreement and to sentence Defendant to a term of imprisonment totaling 60 months, along with the financial consequences referenced above.

> Respectfully submitted,
>
> JOSHUA S. LEVY
> Acting United States Attorney
>
> By: /s/ *William F. Abely*
> William F. Abely
> Benjamin A. Saltzman
> Assistant U.S. Attorneys
> U.S. Attorney's Office
> William.Abely@usdoj.gov

Date:  September 1, 2023

## CERTIFICATE OF SERVICE

I hereby certify that this document will be filed via ECF and thereby served on all counsel of record.  Pursuant to the Court's Procedural Order (Docket 76, ¶ 11), this document will also be sent via email to U.S. Probation.

/s/  *William F. Abely*
William F. Abely
Assistant United States Attorney

Date:  September 1, 2023